**Rosario Cabanatan TARUBAC, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 97–70964.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 11, 1998.

Submission Deferred Dec. 29, 1998.

Resubmitted July 6, 1999.

Filed July 13, 1999.

**19.** *United States v. Karam,* 37 F.3d 1280, 1289 (8th Cir.1994).

**20.** *United States v. Mankins,* 135 F.3d 946, 949 (5th Cir.1998).

Michael P. Karr, Sacramento, California, for the petitioner.

Kathryn M. McKinney, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: FLETCHER, FERGUSON, and THOMPSON, Circuit Judges.

FLETCHER, Circuit Judge:

Rosario Cabanatan Tarubac, a citizen and national of the Philippines, petitions for review of a decision by the Board of Immigration Appeals (BIA) dismissing her appeal from an Immigration Judge's denial of her application for asylum. Tarubac alleges that she has a well-founded fear that the New People's Army (NPA) will persecute her if she returns to the Philippines, and that such persecution will be on account of her political opposition to the NPA's communist cause. We deferred submission of this case until the filing of en banc decisions in *Borja v. INS*, 175 F.3d 732 (9th Cir.1999), and *Briones v. INS*, 175 F.3d 727 (9th Cir.1999). We now grant Tarubac's petition for review.[1]

## I.

As our court in *Borja* recently described, "[t]he New People's Army . . . is a

---

1. Deportation proceedings in this case began before April 1, 1997, and the final order of deportation was issued after October 30, 1996. We have jurisdiction over such cases under old 8 U.S.C. § 1105a(a). *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009, 625–26, §§ 309(c)(1) & (4).

violent, revolutionary Communist group which actively opposes the Philippine government. The NPA has a well-documented history of political violence, including the murder of its opponents." 175 F.3d at 734. Tarubac's experiences with the NPA fit this description.

In the mid–1980s, Tarubac lived and worked in Batac, in the province of Ilocos Norte, the Philippines. She also in the mid–1980s joined a Christian group, and through that group taught Bible classes and performed relief work in poor rural areas. Sometime in 1986, members of the NPA came to the house where Tarubac was staying and demanded that Tarubac stop teaching the Bible, join the NPA, and pay a 30% "revolutionary tax" to the NPA. Tarubac did not give a definitive answer to these demands. Approximately one month later, an NPA operative came to Tarubac's home demanding again that she join the NPA and pay the revolutionary tax. Tarubac replied that she would not join or pay the tax because she was politically and religiously opposed to communism, which the NPA espoused. In Tarubac's words, she told the NPA operative that "I do not believe in the communist system. There's no justice and there's no freedom. And I told them that the communist belief—communists do not believe in—in God."

About one month after Tarubac voiced her opposition to the NPA, two more NPA operatives came to her home, apprehended her, and took her to a house somewhere in the mountains. There an NPA leader told Tarubac that she would be killed if she did not agree to join the NPA. Tarubac again refused to join. In response, the NPA beat her, pulled her hair, and locked her in a small room where she was kept blindfolded, without food, for three days.

Frightened that the NPA would harm her again, Tarubac soon moved to the metropolitan Manila area, an eight-hour drive away. She did not, however, succeed in eluding the NPA. In May, 1987, an NPA messenger delivered a letter to Tarubac in Manila stating that the NPA knew of her opposition to its cause, knew of her whereabouts, and intended to come "pick her up." Tarubac immediately resigned from her job in Manila, went into hiding, and one month later left the Philippines to work in Saudi Arabia.

Tarubac returned to the Philippines to get married in January, 1991. After the wedding she and her husband went to his home in Cagayan province, in northeast Luzon. While there, a man identifying himself as an NPA member approached them and demanded that they provide arms and money. Later, on the night of April 26, 1991, several men with guns came to Tarubac's home. They banged on the door of the house and asked to speak with Tarubac's husband. Tarubac and her husband were certain these men were NPA operatives. Tarubac's husband left by the rear exit of the house and fled to Manila. Tarubac hid in the house all night, and the next day joined her husband in Manila. In May, 1991, Tarubac and her husband received another letter from the NPA threatening to "pick them up" for failing to pay the revolutionary tax. Tarubac and her husband went into hiding, and shortly thereafter left for Saudi Arabia.

In early 1994, Tarubac's work authorization in Saudi Arabia was soon to expire. Based on what members of her family still in the Philippines had told her, Tarubac knew that the NPA continued to be active. She feared that her life would again be in danger if she returned to the Philippines. On July 17, 1994, Tarubac entered the United States on a B–2 visa. She applied for asylum on August 23, 1994, while her B–2 visa was still valid. Her application was denied, but she renewed it after the INS placed her in deportation proceedings in 1995. The IJ who heard Tarubac's testimony found her to be "sincere and genuine" and gave her testimony "full weight as evidence." The IJ concluded, however, that Tarubac did not have a well-founded fear of persecution. Tarubac appealed to the BIA, which affirmed the IJ's decision over one dissent. The BIA concluded that any persecution Tarubac suffered was not

on account of her political opinion as she claimed. The BIA also summarily stated that recent decreases in the NPA's strength meant that Tarubac's fear of future persecution was not well-founded. This petition for review followed.

## II.

■ To be eligible for asylum, Tarubac must show that she is "unwilling or unable" to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Evidence of past persecution alone can establish eligibility for asylum. *See Meza–Manay v. INS*, 139 F.3d 759, 763 (9th Cir.1998). An asylum applicant who establishes that she has suffered past persecution on one of the enumerated grounds is entitled to "the legal presumption that she has a well-founded fear of future persecution." *Borja*, 175 F.3d at 737; *see* 8 C.F.R. § 208.13(b)(1)(i); *Prasad v. INS*, 101 F.3d 614, 617 (9th Cir.1996).

## 1.

■ Tarubac argues that the BIA erred in finding that the persecution she suffered was not on account of her political opinion. We review de novo the BIA's construction of the statutory standards for asylum eligibility. *See Ratnam v. INS*, 154 F.3d 990, 994 (9th Cir.1998); *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir.1996) (en banc). We review the BIA's factual findings for "substantial evidence," and will uphold them if supported by "reasonable, substantial, and probative evidence" in the record. *INS v. Elias–Zacarias*, 502 U.S.

478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

■ Where an asylum applicant claims past persecution on account of political opinion, she must show that (1) she was a victim of persecution, (2) she holds a political opinion, (3) her political opinion was known to her persecutors, and (4) the persecution was on account of her political opinion. *See Vera–Valera v. INS*, 123 F.3d 1302, 1304 (9th Cir.1997). In this case, it is undisputed that Tarubac suffered persecution when she was kidnaped, beaten, held for a period of days, and threatened with more violence.[2] It is also undisputed that she holds a political opinion adverse to the NPA, and that this opinion was known to her persecutors. The second time the NPA approached her to demand that she join their ranks and pay the revolutionary tax, Tarubac said she opposed communism because "[t]here's no justice and there's no freedom." Thus, the only question here is whether the persecution Tarubac suffered was on account of her political opinion.[3]

■ The BIA found that the "attempted recruitment and financial demands inflicted upon [Tarubac] by the NPA are consistent with the nonpolitical end of gaining membership and extorting money." In so finding, the BIA apparently treated the presence of a nonpolitical motive as evidence of the absence of a political motive. This was an error of law. As our court in *Borja* recently made clear, "the plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution solely on account of the victim's political opinion. That is, the conclusion that a cause of

---

**2.** Although the IJ found that the NPA's treatment of Tarubac did not rise to the level of persecution, the BIA did not adopt that finding and thus it is not part of the denial of asylum before us. In any case, we reject the view that Tarubac was not persecuted when she was kidnapped, beaten, and repeatedly threatened. The *Borja* court found that less severe treatment by the NPA constituted persecution. *See Borja*, 175 F.3d at 734.

**3.** It does not matter that the NPA is not part of the government of the Philippines. "[P]ersecution cognizable under the Act can emanate from sections of the population that do not accept the laws of the country at issue, sections that the government of that country is either unable or unwilling to control." *Borja*, 175 F.3d at 736 n. 1.

persecution is economic does not necessarily imply that there cannot exist other causes of the persecution." 175 F.3d at 734 (quoting *Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir.1994)); *see Singh v. Ilchert*, 63 F.3d 1501, 1509 (9th Cir.1995) ("[P]ersecutory conduct may have more than one motive, and so long as one motive is one of the statutory grounds, the requirements have been satisfied."). Thus, a finding that the persecution was motivated by nonpolitical factors is largely irrelevant to an applicant's eligibility for asylum, unless the BIA finds substantial evidence that the *only* motivation for the persecution was nonpolitical. In short, the presence of a nonpolitical motive for persecution does not, without more, prove the absence of a political motive.[4]

We find that Tarubac was persecuted at least in part because of her political opinion. Although the NPA began recruiting her and demanding that she pay a revolutionary tax before they knew of her political views, the most extreme persecution came only after Tarubac had expressed her opposition to communism. Specifically, it was not until Tarubac told the NPA of her opposition to communism that NPA operatives threatened her life, kidnaped her, beat her, held her without food, and pursued her all the way to Manila. *See Borja*, 175 F.3d at 736 (noting that the persecution began after Borja had an "initial hostile political confrontation" with the NPA). It may well be that the NPA interprets any resistance to its demands as an expression of political opposition, and thus imputes a political opinion to anyone refusing to join or pay the revolutionary tax. *See Desir v. Ilchert*, 840 F.2d 723, 727 (9th Cir.1988) ("Refusal to comply with [the Ton Ton Macoutes'] extortionate demands resulted in the attribution of anti-govern-

ment sympathies."). We need not resolve that question here. In this case, where Tarubac not only resisted the NPA's demands but expressed political reasons for her resistance, the NPA's subsequent persecution of her is best understood as being on account of her political opinion. *See Borja*, 175 F.3d at 736.

### 2.

▮ In what it apparently intended as an alternative holding, the BIA held that conditions in the Philippines had changed so much that regardless of what had happened to Tarubac in the past, her fear of future persecution was no longer well-founded. In so holding, the BIA relied exclusively on the Department of State's 1995 Profile of Asylum Claims and Country Conditions for the Philippines (the Profile). The BIA stated:

> According to the [Profile] the NPA's strength is at present substantially diminished from its peak and continues to lose strength due to an amnesty and peace negotiations with the government. The profile states that the NPA's presence is significant in only a small percentage of the Philippines and that the NPA has little or no influence in significant portions of the Philippines. Based on the above, we conclude that the evidence presented failed to establish that the respondent has a well-founded fear of persecution if she were to return to the Philippines.

The INS adopts the BIA's reasoning here. We reject it, for two reasons.

▮ First, in finding that Tarubac "failed to establish . . . a well-founded fear of persecution if she were to return to the Philippines," the BIA erroneously placed the burden of proof on Tarubac. Because

---

4. We emphasize that we do not differ with the BIA's findings of fact on this point. We agree that *one* motivation for the NPA's actions may have been economic. We conclude, however, that the BIA committed an error of law in the significance it accorded to that motivation. When the BIA finds that persecution is not on account of political opinion simply by identi-

fying the presence of one or more nonpolitical motivations but without directly discussing whether the persecution may also have been on account of the victim's political opinion, the BIA misconstrues the legal meaning of the statute's "on account of" language. *See Borja*, 175 F.3d at 735.

Tarubac has shown that she suffered past persecution on account of her political opinion, she is entitled to a legal presumption that she has a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1)(i). Unless the INS can rebut this presumption, Tarubac is eligible for asylum. To rebut the presumption, "the INS must show by a preponderance of the evidence that conditions in the Philippines have changed to such an extent that [Tarubac] no longer has a well-founded fear that she would be persecuted, should she return there." *Borja*, 175 F.3d at 737; *see Garrovillas v. INS*, 156 F.3d 1010, 1017 (9th Cir.1998). Thus, the question before the BIA was not whether the State Department Profile supported Tarubac's claim of a well-founded fear of persecution. Rather, it was whether, in light of the fact that Tarubac did suffer past persecution, the Profile provided sufficient evidence of changed country conditions to rebut the legal presumption of a well-founded fear. Absent an adequate rebuttal to the presumption, Tarubac's case is complete with her showing of past persecution.[5]

Second, burden of proof aside, the substance of the Profile is inadequate to rebut the presumption of a well-founded fear of future persecution. *Borja* examined the very same Profile, and noted "the Profile's unreassuring statements that there are 'fewer' disappearances and politically-related killings, and that peace talks involving the NPA were 'adjourned indefinitely' in 1994 because of 'dissension.'" 175 F.3d at 737 (quoting the Profile). *Borja* also noted the Profile's comment that "the number of 'NPA instigated killings in recent years' is 'declining.'" *Id.* Based on this informa-

tion, *Borja* concluded that "although the current tide of violence may be receding, based on this record it still exists." *Id.*

In this case, the Profile serves to corroborate, not undermine, Tarubac's assertions. It states that the NPA remains active, and that it continues to engage in politically-related violence. *See Borja*, 175 F.3d at 737 ("In fact, the Profile fully corroborates Ms. Borja's testimony that the NPA is a dangerous group that murders people who oppose them."). Accordingly, we hold that the Profile is inadequate to rebut the presumption that Tarubac has a well-founded fear of future persecution. Because it is unrebutted, this presumption becomes our conclusion.

### III.

We conclude that Tarubac did suffer past persecution on account of her political opinion, and that her fear of future persecution is well-founded. She is therefore eligible for asylum. We grant Tarubac's petition for review, reverse the BIA's denial of her request for asylum, and remand the case for the Attorney General to exercise her discretion regarding the grant of asylum.

**PETITION GRANTED.**

---

**5.** The fact that the BIA first held Tarubac was not persecuted on account of her political opinion does not change the analysis. In noting the NPA's decreased strength in recent years, the BIA apparently meant to establish an alternative basis for its dismissal of Tarubac's appeal. An alternative holding is only adequate to support the result if it is separate from and independent of any other basis for the decision. *See generally Stoyanov v. INS*, 172 F.3d 731, 735–36 (9th Cir.1999) (describ-

ing the requirements for an alternative holding on the merits, distinct from a finding of adverse credibility). Thus, to establish an alternative holding based on changed country conditions, the BIA should have assumed, *arguendo*, that Tarubac had suffered past persecution on account of her political opinion, and then determined whether the INS had presented evidence to rebut the legal presumption of a well-founded fear of future persecution.