Benito Eusebio CHANCHAVAC, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 98–71195.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1999

Filed March 27, 2000

As Amended on Denial of Rehearing June 9, 2000.

Joaquin Talleda, Pasadena, California, for the petitioner.

Marion E. Guyton, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before: PREGERSON, NOONAN, and O'SCANNLAIN, Circuit Judges.

Opinion by Judge PREGERSON; Dissent by Judge O'SCANNLAIN.

PREGERSON, Circuit Judge:

Benito Eusebio Chanchavac is a citizen of Guatemala and a Quiche Mayan Indian. He petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's denial of his application for asylum and withholding of deportation. The Immigration Judge found that Chanchavac's testimony was not credible and denied his application on that basis. On appeal, the BIA reversed the Immigration Judge's adverse credibility finding, but decided that Chanchavac failed to establish his eligibility for asylum and withholding of deportation.[1] We have jur-

---

1. At the first hearing, Chanchavac testified in his native language Quiche. That hearing was continued because Chanchavac could not understand the Quiche–English interpreter. Chanchavac testified at the second hearing through a Spanish–English interpreter. On appeal, the BIA rejected Chanchavac's argument that replacing the deficient Quiche interpreter with a Spanish interpreter violated his right to due process. Chanchavac repeats that argument on appeal to this court. Because we find that Chanchavac successfully

isdiction to review a final order of the BIA under 8 U.S.C. 1105a(a)(1). We grant the petition for review and we reverse.

# I

During the 1980s, the Guatemalan military fought a civil war against guerrilla organizations in the country's rural highlands which include the department of El Quiche. Throughout the war, the military accused the Mayan Indians, who populate the besieged region, of supporting the guerrillas and of being guerrilla combatants. The petitioner in this case, Benito Eusebio Chanchavac, is a Quiche Mayan Indian from Primer Centro Xatinap ("Xatinap"), a rural hamlet in El Quiche. He does not support the guerrillas and professes to hold no political opinion.

In the early 1980s, the Guatemalan military surrounded the town of Xatinap and searched homes without warrants. On one occasion, the military entered Chanchavac's home, took him outside, and made him lie on the ground at gunpoint. During this period, many Quiche residents of Xatinap were killed, disappeared, abducted by the military, or went into hiding. Among those killed were two of Chanchavac's relatives. His brother, Vicente Chanchavac Benito, was shot in the head, chest, and arm. His grandfather, Emilio Benito Chavez, was shot in the stomach. Chanchavac believes that the military killed his brother and grandfather. On another occasion, Xatinap church leaders were killed and the church was vandalized. Chanchavac and his neighbors believed that the military was also responsible for that crime.

Fearing that it was not safe to remain in Xatinap, Chanchavac moved to Guatemala City in 1987. Guatemala City is located 167 kilometers from Xatinap. Because the military required him to serve in the civil patrol—a counter-insurgency patrol that guarded Xatinap at night—Chanchavac commuted to Xatinap biweekly to fulfill his service obligation. In 1988, when Chanchavac was traveling between Guatemala City and Xatinap on a bus, guerrillas stopped the bus, ordered the passengers to get off, struck the passengers, killed the driver, and burned the bus. As a result, Chanchavac decided that commuting was not safe. He returned to live in Xatinap because he feared that the military would conscript him if he abandoned the civil patrol.

In 1990, the military sent Chanchavac an induction notice, but Chanchavac did not report for duty. The military never contacted Chanchavac about his failure to report for duty.

In August 1992, ten government soldiers broke down the door of Chanchavac's home in Xatinap. Three or four of the soldiers threw Chanchavac on the ground, aimed their weapons at him, and kicked him all over his body, causing bleeding in his mouth, nose, and on one leg. During the beating, they asked him where his "guerrilla friends" were and accused him of being a guerrilla. The soldiers then searched his house and demanded to see his papers. When Chanchavac showed them his birth certificate, they copied down his name. The soldiers also beat Chanchavac's father. The interrogation, beating, and search lasted about one hour. Chanchavac's mother treated his injuries with herbal remedies and he remained in bed for two days to recover. There is no hospital, doctor, or any other medical facility in Xatinap.

In December 1992, a group of armed men broke into Chanchavac's home around midnight. Identifying themselves as guerrillas, they asked Chanchavac to leave with them. Chanchavac told them that he could not leave because his family depended on him. When he resisted, the intruders began beating him and dragged him away. Chanchavac's mother screamed and awoke neighbors who went outside with

established his eligibility for asylum and withholding of deportation, we do not reach the

due process issue.

sticks and machetes. In the ensuing confusion, Chanchavac escaped. Chanchavac did not return to his home because he feared that he would be killed, either by the guerrillas because he did not accede to their demand or by the military because the guerrillas had been in his house.

Following these incidents, Chanchavac fled Guatemala. He traveled through Mexico and entered the United States near Douglas, Arizona on or about December 25, 1992, without inspection. Chanchavac's parents and sister also fled Xatinap, relocating in another town in the department of El Quiche. Two of Chanchavac's relatives who remained in Xatinap were killed. One was shot and the other was tortured. The government did not investigate their deaths. A friend informed Chanchavac that after Chanchavac left Guatemala, the military compiled lists of people who relocated away from Xatinap.

## II

### Credibility of Chanchavac's Testimony

■ We begin with the question of credibility. The BIA stated that it "[did] not

conclude that this is a case in which an adverse credibility finding would be sustained under the controlling precedent of the Ninth Circuit." We read this statement as an implicit finding of credibility because concluding that an adverse credibility finding would not be sustained is tantamount to finding that Chanchavac's testimony was credible. We agree with the BIA's credibility determination because the record contains no materially inconsistent testimony at all.[2] Thus, we do not remand to the BIA for a credibility determination.

## III

### Statutory Eligibility for Asylum

The Attorney General has discretion to grant asylum to an alien who is a "refugee." *See* 8 U.S.C. § 1158(b). A "refugee" is defined as an alien who is unwilling or unable to return to his or her country of origin due to "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a par-

**2.** The Immigration Judge based her adverse credibility finding on six aspects of Chanchavac's application and testimony: (1) his first asylum application highlighted his membership in an agricultural cooperative, while his second application did not mention the agricultural cooperative but mentioned his participation in the civil defense patrol; (2) he stated that he did not ask his brothers why they came to the United States; (3) when asked why he fled Guatemala instead of moving to another region, he replied, "I have no idea. Maybe I thought they were looking for me."; (4) he carried his birth certificate and $10.00 with him when he fled; (5) he settled in the United States instead of Mexico; and (6) he started to work within one week of arriving in the United States.

With respect to the first reason, the two applications are not contradictory; they simply focus on different aspects of Chanchavac's experiences. Moreover, a notary assisted Chanchavac to complete the first application, while a lawyer advised him on the second application. All that can be concluded from the different focus of each application is that the notary and the lawyer reached different

conclusions as to what parts of Chanchavac's story provided the basis for asylum relief. *See Aguilera–Cota v. INS,* 914 F.2d 1375, 1382–83 (9th Cir.1990) ("A failure to state each and every ground for a claim of political asylum at the time of the initial application should not prejudice the claim.").

All of the remaining reasons are insignificant, reveal nothing about the veracity of Chanchavac's fear of persecution, stem from the Immigration Judge's personal conjecture about what is expected behavior of a Guatemalan Indian, and most likely are attributable to the difficulties arising from the translation problems at the hearing. *See Lopez–Reyes v. INS,* 79 F.3d 908, 912 (9th Cir.1996) (reversing an adverse credibility finding based on the Immigration Judge's personal conjecture about practices in another country); *Aguilera–Cota,* 914 F.2d at 1382 ("[M]inor inconsistencies or misrepresentations of unimportant facts cannot constitute the basis for an adverse credibility finding."); *Damaize–Job v. INS,* 787 F.2d 1332, 1337 (9th Cir.1986) (minor discrepancies attributable to language problems and failure to apply for asylum in other countries are not grounds for an adverse credibility finding).

ticular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The BIA held that Chanchavac failed to establish that he qualified as a statutory refugee.

 We review the BIA's factual findings, including credibility determinations, under the deferential "substantial evidence" standard. *See INS v. Elias–Zacarias,* 502 U.S. 478, 480–81, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). We may only reverse the BIA's factual determinations if "the evidence ... presented was so compelling that no reasonable fact finder could fail to find the requisite fear of persecution." *Id.* at 483–84, 112 S.Ct. 812. We reverse the BIA's finding as to Chanchavac's statutory eligibility for asylum because the evidence in the record compels us to conclude that Chanchavac has a well-founded fear of persecution by the Guatemalan military on account of imputed political support for the guerrillas.

## A

### Well–Founded Fear of Persecution

 An asylum applicant has a "well-founded fear of persecution" if his fear is subjectively genuine and objectively reasonable. *See Fisher v. INS,* 79 F.3d 955, 960 (9th Cir.1996) (en banc). An applicant who demonstrates that he suffered past persecution is entitled the legal presumption that he has well-founded fear of future persecution. *See Borja v. INS,* 175 F.3d 732, 737 (9th Cir.1999) (en banc); 8 C.F.R. 208.13(b)(1)(i).

 The BIA decided that Chanchavac was afraid, but that his fear was not objectively reasonable. Specifically, the BIA held that Chanchavac "suffered an insufficient level of harm to support a factual finding of past persecution based on this incident." We disagree. Chanchavac's personal experiences at the hands of the Guatemalan military, coupled with the evidence of violence against Chanchavac's family and community, clearly constitute persecution as that term is defined.[3] As a result, he is entitled to a legal presumption of a well-founded fear of persecution.

 The Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.,* does not define the term "persecution," but the Supreme Court has described it as "a seemingly broader concept than threats to life or freedom." *INS v. Stevic,* 467 U.S. 407, 428 n. 22, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). Persecution is "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." *Prasad v. INS,* 47 F.3d 336, 339 (9th Cir.1995). "[W]e have "consistently found persecution where, as here, the petitioner was physically harmed." *Duarte de Guinac v. INS,* 179 F.3d 1156, 1161 (9th Cir.1999).

Chanchavac's persecutors engaged in repeated violent attacks against Chanchavac's family and community, and violently attacked Chanchavac himself on one occasion. In August 1992, the military broke into his home and beat him so severely that he was bedridden for two days.[4] The

---

**3.** Because we find that this evidence alone constitutes persecution, we do not discuss the BIA's additional conclusions that "compelled service in a civil patrol is not persecution" and the "December 1992 encounter with the guerrillas was an incident of forced recruitment, not persecution."

**4.** The dissent insists that Chanchavac could not have been *seriously* injured because he did not go to a nearby hospital for treatment. What is relevant to the persecution question is not whether Chanchavac went to a hospital, but whether his injuries were severe enough to merit treatment. Chanchavac testified

credibly that he was beaten so severely that he could not leave his bed for two days, and that he received treatment in his home from his mother. He further explained that he did not go to the hospital because feared the questions he might be asked there.

The dissent second-guesses Chanchavac's explanation for why he decided not to go to the hospital. According to the dissent, Chanchavac must have "belie[ved] that the risks of forgoing the care of a doctor were relatively slight" if his only reason for not seeking such care was a desire to avoid questions. Needless to say, Chanchavac may have believed that the risks entailed in reporting the story of

military also beat his father, pointed their guns at his sister, searched his papers, and copied down his name. This attack was not an isolated incident. Chanchavac also testified about prolific military violence in his town. The military abducted, disappeared, and killed other residents of Xatinap. Two of Chanchavac's close relatives—his brother and his grandfather—were among those killed. On another occasion, the military made Chanchavac lie on the ground at gunpoint. The military also vandalized Chanchavac's church and killed the church leaders. Chanchavac could not escape the violence of daily life in Xatinap because the military required him to return every 15 days to serve in a counter-insurgency patrol.

In addition, Chanchavac presented extensive evidence of political and social turmoil in Guatemala. Numerous reports by nongovernmental organizations document the brutal military violence centered in the rural highlands where Xatinap is located and targeted at Mayan Indians. For in-

stance, on one occasion, the Guatemalan military threatened and attacked members of an Indian village who refused to report which villagers had family members who were killed by the guerrillas. On another, Indians were violently attacked in Guatemala City and accused of being guerrillas because they wore Indian clothing. Forensic experts have exhumed clandestine graves in El Quiche that were filled with Indian corpses. The military also attacked Guatemalan Indians who fled to refuge camps across the Guatemala–Mexico border. According to Amnesty International, "[l]eaving one's community is too frequently taken by the military and their agents as a sign of links with the guerrilla." Amnesty also reports that "[t]hose refusing to take part in [civil patrols] have been branded 'guerrillas', and many have been subjected to human rights violations, including harassment and attacks, 'disappearance' and extrajudicial execution." These reports bolster Chanchavac's account.[5]

his attack to hospital personnel exceeded the risks of forgoing medical care. In any event, the dissent's hypothesis is just the type of impermissible conjecture for which we have reversed decisions of the BIA. *See Lopez–Reyes*, 79 F.3d at 912 (holding that IJ's conclusion that the events to which petitioner testified were astonishing was personal conjecture and not a valid reason for an adverse credibility finding); *Gomez–Saballos v. INS*, 79 F.3d 912, 916 (9th Cir.1996) (rejecting as unreasonable the BIA's conclusion that prisoners would not resent a prison director because the prison director treated his inmates fairly); *Damaize–Job*, 787 F.2d at 1337 (finding that there was no basis for the IJ's assumption that a person fleeing persecution would apply for asylum in the first country in which he arrives); *Del Valle v. INS*, 776 F.2d 1407, 1413 (9th Cir.1985) (rejecting BIA's conclusion that security forces would not re-arrest petitioner because it was based on conjecture).

**5.** We do not find the dissent's reliance on *Prasad v. INS*, 47 F.3d 336 (9th Cir.1995), persuasive. We doubt that conditions in Fiji, an island in the South Pacific, are at all analogous to conditions in the civil war-besieged Indian villages of Guatemala. It is those conditions, coupled with Chanchavac's personal experiences, that give him a well-

founded fear of persecution. Even if Chanchavac's experiences were comparable to the experiences of the petitioner in *Prasad*, we would not find that case to be controlling. The court in *Prasad* emphasized the factors which led it to conclude that the petitioner was not persecuted:

> While we certainly condemn the attack on Prasad, it is not, in our judgment, so overwhelming so as to necessarily constitute persecution by the Fijian Government on account of political opinion or race. The attack was committed by a group of ethnic Fijians, many of whom were dressed in civilian clothes. Prasad was released after the brief detention. He did not require medical treatment. He was not charged with any crime. There is no evidence that the Fijian Government had any continuing interest in Prasad. Indeed, many of the Prasads' relatives still reside in Fiji, apparently without incident.

*Id.* at 339. Chanchavac's experience differs in significant respects. Chanchavac was attacked by Guatemalan military soldiers, not individuals in civilian clothes. He did require medical treatment and was bedridden for two days. There is evidence that the government has a continuing interest in Chanchavac. The military has compiled a list of Xatinap residents who, like Chanchavac, have abandoned

It is also irrelevant that the attempted guerrilla recruitment was what prompted Chanchavac to flee Guatemala. Chanchavac proved that the military persecuted him and consistently testified that he fears both the military and the guerrillas. Nor does the fact that Chanchavac did not flee until four months after the military broke into his home and beat him make his fear any less well-founded. *See Gonzalez v. INS*, 82 F.3d 903, 909 (9th Cir.1996) (finding that the asylum applicant had a well-founded fear where death threats began three years before applicant fled and applicant received no death threats during the last five months in her country); *Ramirez Rivas v. INS*, 899 F.2d 864, 871 (9th Cir. 1990) ("Unless it is the case that the security forces in El Salvador strike rapidly or not at all, the fact that [the petitioner] remained unharmed for a few months while she prepared to leave the country has only marginal probative value.").

## B

### The Guatemalan Military's Motive

■ Having concluded that the Guatemalan military persecuted Chanchavac, we turn to the second requirement for statutory asylum eligibility. The persecution must occur "on account of" a protected ground. 8 U.S.C. § 1101(a)(42)(A). The BIA did not reach the issue of motive because it concluded that Chanchavac was not persecuted and did not have a well-founded fear of persecution. The BIA did, however, acknowledge that the "August 1992 encounter with soldiers at his home may have been connected to imputed guerrilla membership or political opinion." We find, as the BIA suggested, that the Guatemalan military persecuted Chanchavac because of its incorrect belief that Chanchavac supported the guerrillas.

■ An asylum applicant may prevail on a theory of "imputed political opinion" if he shows that the "[p]ersecutor falsely attribute[d] an opinion to [him], and then persecute[d][him] because of that mistaken belief about [his] views." *Canas–Segovia v. INS*, 970 F.2d 599, 601–02 (9th Cir.1992). The Guatemalan military believed that Chanchavac sympathized with and participated in a guerrilla organization. While beating Chanchavac in August 1992, the military accused Chanchavac of being a guerrilla and demanded information about his "guerrilla friends." No reasonable fact finder could fail to find that the military persecuted Chanchavac on account of this imputed political opinion.[6]

the hamlet. Amnesty International reports that, "[l]eaving one's community is too frequently taken by the military and their agents as a sign of links with the guerrilla," precisely the accusation against Chanchavac. Nor were his immediate relatives able to remain in Xatinap "without incident." His immediate family fled and two relatives who stayed behind were killed.

The dissent further suggests that Chanchavac would be safe living in a different town in Guatemala. But, as Chanchavac testified, regardless of where he lived in Guatemala, he *was required to return to Xatinap to participate* in the civil patrol, and according to Amnesty International, "[t]hose refusing to take part in [civil patrols] have been branded 'guerrillas', and many have been subjected to human rights violations, including harassment and attacks, 'disappearance' and extrajudicial execution." Moreover, "[i]t has never been thought that there are safe places within a nation when it is the nation's government that has engaged in the acts of punish-

ing opinion that have driven the victim to leave the country." *Singh v. Moschorak*, 53 F.3d 1031, 1034 (9th Cir.1995).

6. Chanchavac also advances a second, related theory to explain why the military persecuted him. He says that the military persecuted him on account of his race. In support of this theory, he points to his testimony and the reports of nongovernmental organizations that the Guatemalan military routinely accused Mayan Indians who reside in the highlands where he lived of supporting the guerrillas and of being guerrillas. He argues this evidence proves that the military accused him of having ties to the guerrillas merely because he is an Indian. Because we conclude that the motive requirement for asylum eligibility is satisfied in this case solely on the basis of the evidence that the Guatemalan military persecuted Chanchavac on account of imputed political support for the guerrillas, we do not reach the question whether substantial

The INS concedes in its brief that the Guatemalan military imputed guerrilla sympathies to Chanchavac, but it hypothesizes that "Chanchavac's own refusal to fulfill a [military] service obligation may have been the catalyst" for the beating. There is absolutely no evidence that the military's motive for beating him was to punish him for not joining their ranks and it would be improper for us to speculate about this possibility. *See Del Valle,* 776 F.2d at 1413 (conclusions must be based on substantial evidence, not conjecture). Even if this theory had support in the evidence, it would only prove that the Guatemalan military had two motives when it persecuted Chanchavac. This court, sitting en banc, recently held that evidence of a mixed motive does not defeat an asylum claim, so long as one of the motives is a protected ground. *See Borja,* 175 F.3d at 736.

## C

### Conditions in Guatemala

 The INS may rebut the presumption, arising from proof of past persecution, that the petitioner has a well-founded fear of future persecution on account of a protected ground by showing that conditions in the applicant's home country have changed. *See Singh v. Ilchert,* 69 F.3d 375, 379 (9th Cir.1995); *Tarubac v. INS,* 182 F.3d 1114, 1120 (9th Cir.1999). We find that the INS failed to carry its burden.

 The INS introduced into evidence the 1995 State Department Country Report for Guatemala. It points to statements in the report that guerrilla strength has declined, that guerrilla recruitment is confined to the rural highlands, and that persons who fail to report for military service are inducted into the army, not prosecuted. None of this information rebuts the presumption that Chanchavac has a well-founded fear of persecution if he returns to Guatemala. Chanchavac does not fear military induction; he served in the civil patrol, a substitute for military service. He fears being beaten and killed by the military on account of imputed sympathy for the guerrillas. Moreover, Xatinap is located in the rural highlands where, according to the report, the guerrillas remains active and where military counter-insurgency activity continues.

The State Department Report also declares that human rights "violations continue at an alarming rate," that the number of political killings increased, and that the government failed adequately to investigate most of the political killings. Far from demonstrating that Chanchavac's fears are excessive, this report gives us further reason to believe that Chanchavac's fears are warranted. *Cf. Duarte de Guinac,* 179 F.3d at 1163 (finding that the same report was insufficient to rebut a presumption of a Quiche Indian's well-founded fear of persecution on account of his race).

## IV

### Withholding of Deportation

 An asylum applicant is entitled to withholding of deportation if he shows that the evidence in the record demonstrates a clear probability of persecution. *See Korablina v. INS,* 158 F.3d 1038, 1045 (9th Cir.1998). There is a clear probability of persecution if "it is more likely than not that the alien would be subject to persecution." *Stevic,* 467 U.S. at 424, 104 S.Ct. 2489. "A key factor in finding evidence sufficient for withholding of deportation is

---

evidence might compel a finding of persecution on account of a protect ground, even in the absence of any direct evidence.

whether harm or threats of harm were aimed against the petitioner *specifically.*" *Vilorio–Lopez v. INS*, 852 F.2d 1137, 1141 (9th Cir.1988) (emphasis added); *see also Gonzales–Neyra v. INS*, 122 F.3d 1293, 1297, *amended by* 133 F.3d 726 (9th Cir. 1998). The military targeted Chanchavac specifically when it broke into his home, beat and interrogated him, and copied down his name. As a result, we find that Chanchavac is eligible for withholding of deportation.

## V

We grant the petition for review and reverse the BIA's denial of Chanchavac's application for asylum and withholding of deportation. We remand to the BIA so that the Attorney–General may exercise her discretion to grant asylum. The application for withholding of deportation shall be granted.

PETITION GRANTED. REVERSED AND REMANDED.

O'SCANNLAIN, Circuit Judge, dissenting:

Here, the court reverses the BIA's determination that the petitioner, Benito Eusebio Chanchavac ("Chanchavac"), has failed to demonstrate either that he has been persecuted in the past or that his fear of future persecution in Guatemala is otherwise objectively reasonable. Because substantial evidence supports the BIA's determination, I must respectfully dissent. Chanchavac simply has not adduced evidence that is "so compelling that no reasonable factfinder could fail to find" that he has suffered past persecution or has a well-founded fear of future persecution. *INS v. Elias–Zacarias*, 502 U.S. 478, 484, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

## I

Our decision in *Prasad v. INS*, 47 F.3d 336 (9th Cir.1995), plainly establishes that the BIA's determination in this case rests on substantial evidence. In *Prasad*, we held that the petitioner, an ethnic Indian who resided in Fiji, had not provided "compelling" evidence of past persecution, despite the fact that he had demonstrated both that other ethnic Indians were routinely persecuted in Fiji due to their race and that he himself had been incarcerated, interrogated, and beaten by uniformed officials because of his activity in a political party led by ethnic Indians. *See id.* at 339 ("While we certainly condemn the attack on Prasad, it is not, in our judgment, so overwhelming so as to necessarily constitute persecution. . . ."). Moreover, our conclusion in *Prasad* was not altered by the fact that other ethnic Fijians had stoned the petitioner's house and attempted to rob his family, *see id.* at 340 ("Other evidence . . . is not enough, either alone or in combination with the above, to compel a factfinder to conclude that persecution or a well-founded fear of persecution existed."), or by his claims that other family members had been raped and murdered by soldiers, *see id.* ("Attacks on family members do not necessarily establish a well-founded fear of persecution absent a *pattern* of persecution tied to the petitioners." (emphasis added)).

Like the petitioner in *Prasad*, Chanchavac's testimony indicates that he endured only one physical assault that could be fairly characterized as the basis for an asylum claim: In 1992, soldiers entered his home and beat him and his father while asking Chanchavac about his "guerrilla friends." The other assaults on Chanchavac either did not involve physical abuse or were not on grounds enumerated in the Immigration and Nationality Act. *See* 8 U.S.C. § 1101(a)(42)(A). Nearly twenty years ago, Chanchavac was taken from his home and guarded at gunpoint while soldiers searched his home, but he does not claim that he was injured in any way during the incident. Twelve years ago, Chanchavac was assaulted by guerrillas when they robbed and burned a public bus on which he was riding, but there is no reason to believe that they attacked his bus be-

cause of his race or political beliefs-or even because he was on it. The last assault occurred seven years ago, when some guerrillas attempted to abduct Chanchavac, and he ascribes to them only the motive of wanting him as a comrade.

The majority nevertheless conjures up several imaginary differences in its attempt to distinguish Chanchavac's case from that of the petitioner in *Prasad.* The majority notes, for instance, that the court in *Prasad* relied on the fact that the petitioner did not need any medical treatment. *See supra* at 590 n. 5. There is, however, ample evidence in this case that supports the conclusion that Chanchavac did not need medical attention either. Chanchavac has not claimed that he required medical treatment after his run-in with the military, and he made no effort to seek it at that time. Although the majority suggests that Chanchavac's failure to do so was the result of the fact that "[t]here is no hospital, doctor, or any other medical facility in Xatinap," *see supra* at 590, the record does not support the inference that medical care was not accessible. Chanchavac acknowledged that it was available less than two miles from his home. Indeed, Chanchavac's testimony strongly suggests that his failure to seek medical attention can be attributed instead to the fact that he was not significantly harmed, for his explanation that he did not seek medical treatment because "they ask a lot of questions" at the hospital betrays his belief that the risks of forgoing the care of a doctor were relatively slight.

The majority also implies that the court in *Prasad* relied significantly on the fact that the petitioner's attackers were "individuals in civilian clothes." *Supra* at 590 n. 5. This proposition is obviously overstated, however, for there was no question that several of the assailants in *Prasad*

were "dressed in military uniforms" and took the petitioner "to a police station, where he was placed in a jail cell." *Prasad,* 47 F.3d at 339; *see also id.* at 341 ("Fijian army personnel and others punched, kicked, interrogated, and imprisoned Prasad....") (Pregerson, J., dissenting).

The majority also contends that *Prasad* is distinguishable because, in this case, there "is evidence that the government has a continuing interest in Chanchavac." *See supra* at 590 n. 5. Chanchavac, however, has presented no more evidence than existed in *Prasad* to establish the government's continuing interest. The majority notes that the Guatemalan military is rumored to have compiled a list of former residents of Chanchavac's hometown. *See id.* Despite the majority's dutifully ominous tone, however, Chanchavac has offered no hypothesis that the military is going to put the list to any sinister use-if the list exists at all. It is not our place to imagine the military's nefarious purpose ourselves and fault the BIA for declining to partake of the fantasy.

The majority makes another remarkable attempt to distinguish this case from *Prasad* by observing that, in that case, "many of the petitioner's relatives continued to reside in his home country without incident." *Id.* Precisely the same thing, however, is true of Chanchavac's relatives. After he left Guatemala, his three brothers continued to live, apparently unharmed, in his hometown for some time before coming to the United States, and his father, mother, and sister only moved to the neighboring town less than two miles away, where they have lived "apparently without incident."[1] *Prasad,* 47 F.3d at 339. The majority makes much of the fact that two of Chanchavac's more distant relatives

1. When asked at his deportation hearing why he thought his brothers ultimately came to the United States, Chanchavac stated that he did not know. When asked why he did not move with his parents and sister to the neighboring town, Chanchavac replied, "I have no idea why I didn't go." These responses establish that Chanchavac does not believe that even the vicinity of his hometown was pervasively dangerous when he left-and there is no basis whatsoever for concluding that the area is any more dangerous now than it was then.

have been slain since he left. There is nothing in the record, however, to indicate just how distantly related the deceased were, and Chanchavac's testimony indicates that he has no idea why or by whom they were killed. In *Prasad*, we gave little consideration to the fact that the petitioner's cousin had been murdered by soldiers, because the petitioner "did not indicate why they were singled out ... or attempt to establish a connection to the [petitioner]." *Id.* at 340. To the extent, then, that *Prasad* can be distinguished in light of the evidence in that case that the petitioner's family was persecuted, it is only because the petitioner in *Prasad* had a stronger claim than Chanchavac does.

Failing to distinguish *Prasad* favorably on any specific and relevant basis, the majority resorts to the general and unsubstantiated observation that conditions in Fiji, from whence the petitioner in *Prasad* hailed, are not "at all analogous to conditions" in Chanchavac's homeland of Guatemala. *See supra* at 590 n. 5. With all due respect, this observation is about as helpful as noting that *Prasad* was decided on a different day of the week. As we have repeatedly held, the general conditions in an asylum-seeker's native land cannot provide the basis for his eligibility for asylum when evidence of particularized individual persecution is lacking. *See, e.g., Martinez–Romero v. INS*, 692 F.2d 595, 595–96 (9th Cir.1982). Moreover, nothing in the Immigration and Nationalization Act sets forth a different evidentiary standard for Guatemalans than for Indo–Fijians.

## II

To hold, as the court does today, that the evidence here is "so compelling that no reasonable factfinder could fail to find" that Chanchavac has an objectively reasonable fear of persecution, *Elias–Zacarias*, 502 U.S. at 484, 112 S.Ct. 812, despite our having reached the opposite conclusion on starkly similar facts in *Prasad*, makes a mockery of the substantial evidence standard to which we must adhere. Under that standard, we must defer to the determination of the BIA unless it would be plainly unreasonable to do so. "We are not permitted to substitute our view of the matter for that of the Board." *Prasad*, 47 F.3d at 340. Because the majority does so, I respectfully dissent.[2]

---

2. Because I cannot agree that a reasonable factfinder would be compelled to conclude that Chanchavac has an objectively reasonable fear of persecution upon his return to Guatemala and thus is eligible for asylum, I must dissent all the more vigorously from the majority's determination that "it is more likely than not" that his fears would actually be realized and that he is thus entitled to withholding of deportation. *Cf. Prasad,* 47 F.3d at 341 (noting that the petitioner must meet a "more stringent standard" to qualify for withholding of deportation than he must meet for asylum).