Ana Maria LANZA, Petitioner,

v.

John ASHCROFT, Attorney
General, Respondent.

No. 02–73538.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 6, 2004.

Filed Nov. 22, 2004.

Daniel M. Kowalski, Austin, TX, for the petitioner.

Peter D. Keisler and Linda S. Wendtland, United States Department of Justice, Civil Division, Washington, D.C., for the respondent.

Before: GOULD, PAEZ, Circuit Judges, and SILVER,* District Judge.

* The Honorable Roslyn O. Silver, United States District Judge for the District of Arizona, sitting by designation.

SILVER, District Judge.

Petitioner Ana Maria Lanza ("Lanza"), a native of Argentina, seeks review of a final order of the Board of Immigration Appeals (the "BIA" or the "Board") denying her petitions for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). An Immigration Judge ("IJ") found that Lanza's asylum application was untimely and that Lanza did not establish extraordinary circumstances to excuse that untimeliness. *See* 8 U.S.C. § 1158(a)(2)(B), (D) (2000). As an alternative finding, the IJ denied Lanza's asylum claim on the merits. Finally, he denied Lanza's petitions for withholding of removal and CAT relief. Lanza appealed, and the BIA affirmed without opinion pursuant to its streamlining regulations. *See* 8 C.F.R. § 1003.1(e)(4) (2004).

When the BIA streamlines and affirms without opinion, it endorses the result but not necessarily the reasoning of the IJ. *Id.* § 1003.1(e)(4)(ii). In *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 851 (9th Cir.2003), we held that even though streamlining conceals the reasons for the BIA's decision, this circumstance does not compromise our ability to review the agency's action because we may bypass the BIA and review the IJ's decision directly. Although streamlining allows the Board "to affirm the IJ's decision based on different reasons than those set forth by the IJ," we noted that "the BIA is cognizant of this possibility and knows the risk it takes in declining to articulate a different or alternate basis for the decision." *Id.*

But we also expressed concern in *Falcon Carriche* about "potentially anomalous" situations in which the petitioner presents to the BIA grounds that are both reviewable and unreviewable in federal court and the BIA's subsequent affirmance without

opinion "prevents us from discerning the reasons for the BIA's decision." *Id.* at 855 n. 10; *see also id.* at 856 n. 2 (T.G. Nelson, J., concurring in part and dissenting in part). In such cases the BIA could conclude that the IJ erred on the unreviewable ground, but reason that the error was harmless and affirm on the basis of the reviewable ground. Because the BIA does not issue a reasoned decision when it affirms without opinion, we would have no way of knowing that the BIA rejected the unreviewable ground. We would then be faced with a dilemma: should we assume that the BIA relied on the unreviewable ground and dismiss the appeal for want of jurisdiction, remand for clarification, or assume that the BIA affirmed on the basis of the reviewable ground?

This appeal requires an answer to that question. The IJ rejected Lanza's asylum claim on alternative grounds—one reviewable in federal court (the merits) and the other unreviewable (untimeliness). The BIA affirmed without opinion, and we do not know the reasons for its affirmance. The Government argues that the IJ's untimeliness finding controls the decision on appeal and that we should therefore dismiss Lanza's asylum claim for lack of jurisdiction. We reject this argument. We cannot ignore the possibility that the BIA may have rejected the IJ's untimeliness finding and affirmed on the merits. If the BIA in turn erred in affirming on the merits and we dismiss for lack of jurisdiction, Lanza will be erroneously removed to a country she claims will persecute her without receiving the benefit of her statutory right to have this Court review the BIA's decision. This would work a serious deprivation of due process.

Due process requires us to either review the merits of Lanza's asylum application or remand to the BIA for clarification of the grounds for its decision. Given the gener-

al presumption against federal jurisdiction, we remand for clarification. Because there are no barriers to our review of Lanza's withholding of removal and CAT claims, we reach the merits of those claims and we affirm.

## BACKGROUND

### I. The Removal Proceedings

Lanza entered the United States on March 20, 1990, by crossing the border from Mexico. She eventually moved to Seattle. On October 8, 1999, the Immigration and Naturalization Service ("INS")[1] charged Lanza with removability for illegal entry. Lanza conceded removability, but applied for asylum, withholding of removal, and CAT relief. She alleged that she had been and would be persecuted in Argentina because of her political opinions.

The IJ held a removal hearing on May 19, 1999. In an oral decision entered on November 4, 1999, he found Lanza removable. He also denied Lanza's requests for relief from removal and granted Lanza the privilege of voluntary departure. Lanza appealed to the BIA. The BIA affirmed without opinion on September 26, 2002. Lanza timely appealed to this Court on October 24, 2002.

### II. Lanza's Affidavit and Oral Testimony

Lanza was born in Comodoro Rivadavia, Argentina on June 20, 1955. She attended the University of Buenos Aires for two years in the early 1980s, and then went on to work as a file clerk at the Municipal Offices of Caseros. Lanza claimed that while working as a municipal employee, she became involved in the Union Civica

Radical ("UCR"), a political party led by Raul Alfonsin ("Alfonsin"). Alfonsin was opposed to Argentina's military-run government and wanted to return Argentina to democracy. Lanza said that she acted as a liaison between the party and the community and lobbied for votes on the party's behalf.

In 1983, following the defeat of the Argentine military in the Falklands/Malvinas War, Argentina held a free general election. Alfonsin was elected president. Lanza testified that she became a well-known union organizer during Alfonsin's presidency and continued to assist the UCR with its campaigns and activities. She alleged that she, along with others, founded Asociacion Sindical de Agentes Municipales, a union for municipal agents and employees.

An early presidential election was held in May 1989. Argentina was experiencing food shortages, unemployment, and civil unrest. Alfonsin was defeated and Carlos Saul Menem ("Menem"), a member of the Peronist Justicialist Party, was elected president. Lanza testified that she remained noticeably active in the UCR during Menem's presidency. In particular, she said that she opposed Menem's attempts to privatize state-owned businesses. Lanza claimed that she was blacklisted by the Menem government and lost her job at the Municipal Offices. She also said that she could not find suitable work for a person with her qualifications.

Lanza claimed that her troubles with the Menem government escalated in February 1990. She alleged that three men came to her home in Buenos Aires the night of February 19, 1990. She said that they first went to the room where her young

1. As of March 1, 2003, the INS was abolished and its functions were transferred to the Department of Homeland Security. *See* 6 U.S.C.A. § 542 (West Supp.2004). Because the agency was known as the INS while the IJ and BIA considered Lanza's case, reference will be to the "INS," the "Agency," or the "Government."

daughter was sleeping and closed the door as they passed.[2] Lanza claimed that they then went over to her (Lanza), pushed her against the wall, and told her to sit in a chair. She alleged that the men punched her, called her a "crazy nationalist" and "stupid idealist," and told her that "women should not be in politics." She also alleged that they threatened to kill her and her daughter if she continued her political activities. Lanza claimed that the men were members of the Comando de Organizacion, a paramilitary group that took orders from Menem's Peronist Justicialist Party. She admitted that she never reported this incident to the police. She also admitted that she did not receive other threats while she was in Argentina.

After this alleged incident, Lanza went to the United States Embassy in Buenos Aires and applied for a tourist visa.[3] She did not ask for asylum. The Embassy denied her visa application on February 22, 1990. Lanza claimed that she met with a friend from the Embassy soon afterwards.[4] She said that her friend gave her the phone number of a man in Mexico named John who could take her to the United States if she wanted. On March 14, 1990, Lanza flew to Acapulco, Mexico with her daughter. Lanza testified that she had no intention of staying in Mexico for an extended period of time or of immigrating to the United States. She said that she planned to return to Buenos Aires after a few months and that she "viewed the time in Acapulco as a vacation and a period of reflection."

Lanza testified that her intentions changed after arriving in Mexico. She said that she telephoned her father in Argentina once she arrived in Acapulco. Her father allegedly told her that two men had come looking for her. The men supposedly asked her father for details about where she was and when she would return. Lanza claimed that she was frightened and wanted to go to the United States. She said that she traveled from Acapulco to Tijuana and then called her contact, John. John agreed to take Lanza and her daughter across the border for $1,500.00. Lanza and her daughter entered the United States on March 20, 1990, near San Ysidro, California. They eventually moved to Seattle, Washington.

From 1990 to 1992, Lanza made no attempt to apply for asylum. In 1992, while living in Seattle, Lanza married Roy Rowan ("Rowan"), an American citizen. Lanza testified that she did not try to adjust her immigration status during the marriage because she "d[id]n't know very much about the law." In 1994, Rowan moved to Atlanta to train for a job with IBM. Lanza planned to follow, but Rowan soon told Lanza that he was having an affair. Lanza testified that she wanted a divorce, but she said Rowan cautioned against it, insisting that Lanza would be "protected" if they remained married. Rowan died of AIDS in Georgia in 1996, after the couple had separated.[5]

2. Although Lanza's daughter is no longer a minor and lives in the United States, she did not testify at Lanza's hearing or otherwise offer evidence on Lanza's behalf.

3. Lanza had already applied for an Argentine passport on February 5, 1990, two weeks before the alleged home invasion.

4. Lanza tried to locate this friend to corroborate her story, but she stated that she could not find him.

5. Lanza has been tested for HIV and the result was negative. In the proceedings below, the Government suggested that Lanza's marriage to Rowan was a sham. Lanza appears to deny this, but admits that her second marriage to Willie Ray James was one of convenience. *See infra.*

Three months after Rowan's death, Lanza married Willie Ray James ("James"). The two eventually bought a house together in Seattle. Lanza admitted that she knew that James was gay and that he had been diagnosed with HIV. She acknowledged that the primary purpose of the marriage was to help her with her immigration problems. She claimed that James was a "very good friend" and that she was going to help him live a "healthier life." She also testified that she paid him money for his "troubles." The couple had an interview with the INS on March 23, 1998. Three days after their interview with the INS, James left Lanza and withdrew the visa petition that he had filed on her behalf.

At her May 19, 1999 hearing, Lanza claimed that she would be persecuted if she returned to Argentina because the Menem government was still in power.[6] She admitted that she has not kept up with politics since leaving Argentina and that she did not know anything about the status of the UCR. She testified, however, that she would continue to speak out against the government if she was deported to Argentina. She told the IJ that she was not sure if any harm would come to her if she chose not to speak out against the government. She admitted that her brother, who was also a member of the UCR and continues to live in Argentina, has never been harmed.

## III. The Immigration Judge's Decision

### A. Timeliness

In his November 4, 1999 decision, the IJ first addressed whether Lanza had timely filed her asylum petition. The Government argued that Lanza was ineligible for asylum because she did not file for asylum before April 1, 1998, as required by 8 U.S.C. § 1158(a)(2)(B) and 8 C.F.R. § 208.4(a)(2). Lanza claimed that she had no need to apply for asylum because she thought she would be allowed to remain in the United States through spousal petitions. The IJ concluded that Lanza failed to establish "extraordinary circumstances" to excuse her failure to file within the limitations period. *See* 8 U.S.C. § 1158(a)(2)(D); 8 C.F.R. § 208.4(a)(5) (2004). He noted: "[o]bviously, the exceptions seem aimed at the asylum candidate asserting an inability to apply and do not cover any asylum candidate with no need to apply." He also noted that Lanza's second marriage to James was not stable and should not have been relied on as a substitute for asylum.

### B. Well–Founded Fear of Future Persecution

In his alternative finding on the merits of Lanza's asylum claim, the IJ held that Lanza failed to demonstrate a subjectively genuine or objectively reasonable fear of persecution.

### 1. Subjective Fear of Persecution

On the issue of subjective fear of persecution, the IJ found that Lanza's failure to timely apply for asylum after her arrival in the United States indicated "a lack of urgency in seeking ... the safety of this country." He also found "at least the second marriage [to James] appears to have been a marriage of convenience" and that "resorting" to such a marriage "without [ ] first [seeking] asylum" suggested a "lack of true fear."

The IJ next observed that Lanza had no involvement with the UCR since coming to

---

**6.** Menem's final year in office was 1999. *See* United States Dep't of State, *Background Note: Argentina, available at* http://www.state.gov/r/pa/ei/bgn/26516.htm (last visited Sept. 21, 2004).

the United States in 1990. He found it "unlikely she would be so disinterested in Argentinean politics and the activities of her union if she had truly been an activist." The IJ also observed that "[Lanza's] brother belonged to the union and shared her feelings and yet he has never been harmed" and that Lanza seemed to concede "if she were not critical of the government ... she would not be harmed."

## 2. Objectively Reasonable Fear of Persecution

On the question of objectively reasonable fear, the IJ relied on the 1998 United States Department of State Country Report on Human Rights Practices for Argentina (the "Report"). The IJ noted that the Report stated "there were no reports of politically motivated killings" or "politically motivated disappearances" in 1998. He also observed that the Report stated that Argentina's "constitution prohibits torture and the criminal code provides penalties for those who torture that are similar to those for homicide." The IJ explained that though the Report acknowledged that police brutality was a problem, it did not indicate that the police targeted individuals because of their political opinion.

The IJ noted that the Report stated that Argentina's constitution provides for freedom of speech, freedom of the press, and freedom of peaceful assembly, and that those freedoms are respected in practice. He also noted that the Report indicated that "[a] number of independent newspapers and magazines publish freely and privately owned radio and television stations broadcast freely as well." The IJ acknowledged that the government had been called from time to time to break up demonstrations in different provinces and that a few high-profile journalists had been harassed by the government, but he did not find these instances of repression significant.

The IJ found it "unlikely that anyone would be interested in [Lanza] now if she returned bearing in mind the present conditions." "Even by her own analysis," he said, "if she does not speak out against the government she will likely not be harmed."

## C. Past Persecution

With respect to past persecution, the IJ indicated that he believed Lanza's home invasion story was false. The IJ found it "significant that [Lanza] had already applied for a passport" before the alleged home invasion. In his view, this suggested that Lanza "intended to travel" and fabricated the story about the armed men. He also noted that Lanza's "testimony that she did not plan to go to the United States when she went to Mexico and only decided after she got there was not plausible" and "reflect[ed] adversely on her candor and honesty."

The IJ also assumed for the sake of argument that Lanza's home invasion story was true, and, relying on *Prasad v. INS*, 47 F.3d 336, 339 (9th Cir.1995), found that "the ... episode where men broke into [Lanza's] home and pushed her and hit her and threatened her" did not amount to past persecution. Citing *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir.1984), the IJ also noted: "With regard to the threats, persecution encompasses more than just threats, what matters is the will or ability to carry it out."

## D. Withholding of Deportation and CAT Claims

Because the IJ found that Lanza had not established past persecution or a well-founded fear of future persecution, he also found that Lanza failed to meet the more stringent requirements for withholding of

deportation under 8 U.S.C. § 1231(b)(3)(A). As to the CAT claim, the IJ concluded that Lanza "had not shown by a preponderance of evidence that she would be subjected to torture by anyone."

## IV. The BIA's Determination

Lanza appealed, and the BIA issued a streamlined affirmance without opinion. It reads in relevant part: "The Board affirms, without opinion, the results of the decision below. The decision below is, therefore, the final agency determination."

## ANALYSIS

## I. Lanza's Asylum Claim

### A. The Jurisdictional Bar

On appeal, Lanza challenges both the IJ's rejection of her asylum claim as untimely and his rejection of her asylum application on the merits. Where, as here, the BIA streamlines and affirms the result of the IJ's decision without opinion, we review the IJ's decision. *See Falcon Carriche*, 350 F.3d at 851. We turn first to Lanza's challenge to the IJ's procedural determination—that Lanza's petition was untimely filed—and decline to consider that challenge for lack of jurisdiction. This Court generally has jurisdiction to review final orders denying asylum. *See* 8 U.S.C. § 1252(a)(2)(B)(ii) (2000). Our jurisdiction to review a rejection of an asylum application as untimely, however, is precluded by statute. 8 U.S.C. § 1158(a)(3) provides that "no court shall have jurisdiction to review any determination by the Attorney General under paragraph [a](2)." Paragraph (a)(2) includes the provisions concerning whether the alien filed his or her application within a year of entry and whether "extraordinary circumstances" exist excusing an alien's delay in filing an application. 8 U.S.C. § 1158(a)(2)(B), (D).

Although Lanza argues that § 1158(a)(3)'s jurisdictional bar violates due process, this Court rejected such a challenge in *Hakeem v. INS*, 273 F.3d 812, 815–16 (9th Cir.2001). "[A] panel may not consider the correctness of an earlier panel's decisions unless an en banc decision, Supreme Court decision, or subsequent legislation undermines [that] decision[ ]." *Ladha v. INS*, 215 F.3d 889, 896 (9th Cir.2000) (internal citations and quotations omitted) (second and third alterations in original). There is no basis for reconsideration of *Hakeem* here.

### B. The Merits

We next address Lanza's challenge to the IJ's alternative decision to deny asylum on the merits. The Government argues that the IJ's untimeliness determination disposes of Lanza's asylum claim in its entirety. We reject that argument because of the interplay between the IJ's alternative holding, § 1158(a)(3)'s jurisdictional bar, and the BIA's affirmance without opinion. In this case, the BIA's affirmance without opinion leaves us unable to discern whether the reviewing BIA member affirmed the IJ on a reviewable ground (the merits) or an unreviewable ground (untimeliness). Although the Government argues that the IJ's untimeliness finding controls notwithstanding this uncertainty, we find that due process requires us to either assume that the BIA relied on the reviewable ground or to remand this case to the BIA for clarification of the grounds for its decision. Given the general presumption against federal jurisdiction, we remand.

#### 1. Streamlining

The Attorney General adopted streamlining regulations in 1999 to deal with a vast increase in the BIA's caseload. *Falcon Carriche*, 350 F.3d at 849. The BIA

had more than 28,000 new appeals in 1998—up from fewer than 3,000 in 1984. *Id.* "In an effort to meet its 'overriding objective of providing fairness in adjudicating appeals,' the BIA decided to limit the use of three-judge appellate panels to cases with 'a reasonable probability of reversible error in the result below.'" *Id.* (quoting *Executive Office of Immigration Review; Board of Immigration Appeals: Streamlining,* 64 Fed.Reg. 56,135–36 (Oct. 18, 1999)).

The streamlining regulations allow a single member of the BIA to affirm an IJ's decision without opinion if the member determines that the result was correct, and that "(A) [t]he issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation; or (B) [t]he factual and legal questions raised on appeal are [so insubstantial that a written opinion is not warranted]." 8 C.F.R. § 1003.1(e)(4)(i)(A)-(B). An affirmance without opinion does not imply approval of any or all of the IJ's reasoning: it merely signifies that the reviewing BIA member considered any errors made by the IJ harmless or immaterial. 8 C.F.R. § 1003.1(e)(4)(ii).

In *Falcon Carriche,* 350 F.3d at 850–51, we joined our sister circuits and held that it does not violate due process for a single BIA member (versus a three-judge panel) to decide an alien's administrative appeal.[7] We also rejected the contention that streamlining violates due process by restricting an alien's right of review in the

federal courts. *Id.* at 851. Citing 8 C.F.R. § 3.1(a)(7)(iii) (2003) (now codified at 8 C.F.R. § 1003.1(e)(4)(ii)), we noted that "[when] the BIA streamlines a case, the IJ's decision becomes the final agency decision, and the regulatory scheme gives us a green light to scrutinize the IJ's decision as we would a decision by the BIA itself." *Id.* at 855. The "practical effect" of streamlining is that, "unless the BIA opts for three-judge review, the IJ's decision becomes the BIA's decision" and we evaluate the IJ's decision as we would that of the Board. *Id.* at 851.

But we also expressed concern in *Falcon Carriche* about "potentially anomalous situation[s]" where streamlining could raise serious due process and judicial review issues. *Id.* at 855 n. 10; *see also id.* at 856 n. 2 (T.G. Nelson, J., concurring in part and dissenting in part). In a streamlined order, the BIA accepts only "the result" of the IJ's deliberations. 8 C.F.R. § 1003.1(e)(4)(ii). The regulations foreclose the BIA from giving "explanation or reasoning" and disavow any implication that the BIA's approval extends any further than the outcome. *Id.* Thus, in any case where the BIA disagrees with the IJ in whole or in part, but has an alternative and independent basis for denial, that basis will never be disclosed or reviewed.

As we pointed out in *Falcon Carriche,* in many if not most cases, the fact that we do not know the actual reasons for the BIA's decision is no cause for concern. We continue to have the IJ's decision for review, and "it is the BIA, not the alien petitioner,

---

7. The BIA's streamlining regulations have recently been the subject of a number of unsuccessful attacks in the circuit courts. *See, e.g., Belbruno v. Ashcroft,* 362 F.3d 272, 278–83 (4th Cir.2004) (rejecting due process and Immigration and Naturalization Act challenges); *Denko v. INS,* 351 F.3d 717, 729–30 (6th Cir.2003) (rejecting due process and regulatory challenge); *Khattak v. Ashcroft,* 332 F.3d 250, 252–53 (4th Cir.2003) (rejecting argument that the regulations are "impermissibly retroactive"); *Georgis v. Ashcroft,* 328 F.3d 962, 966–67 (7th Cir.2003) (rejecting due process challenge); *Mendoza v. U.S. Att'y Gen.,* 327 F.3d 1283, 1288–89 (11th Cir.2003) (same); *Soadjede v. Ashcroft,* 324 F.3d 830, 831–33 (5th Cir.2003) (same); *Albathani v. INS,* 318 F.3d 365, 377 (1st Cir.2003) (same).

that is saddled with any errors the IJ makes and with the risk of reversal on grounds that do not reflect the BIA's actual reasons" for affirming. *Falcon Carriche*, 350 F.3d at 855. "In this way, the streamlining procedures are similar to the BIA's already-familiar practice of adopting the IJ's opinion without issuing a separate written opinion where the IJ's reasoning is sufficient." *Id.* at 851 (citing *Alaelua v. INS*, 45 F.3d 1379, 1382 (9th Cir.1995)); *see also Chen v. INS*, 87 F.3d 5, 7–8 (1st Cir.1996) ("[I]f the Board's view is that the IJ 'got it right,' the law does not demand that the Board go through the idle motions of dressing the IJ's findings in its own prose.").

But problems arise when the jurisdiction-stripping rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009, 3009–546 (1997) (codified in scattered sections of 8 U.S.C.), enter the mix. Before Congress enacted the IIRIRA, judicial review of immigration decisions was governed by 8 U.S.C. § 1105a, which set forth the sole and exclusive procedure for 16189 review of final deportation and exclusion decisions. *See* 8 U.S.C. § 1105a (1994). Final orders of deportation were reviewable in the federal courts of appeal, and appellate courts reviewing those orders generally considered all legal questions encompassed by the order. The IIRIRA, however, " 'dramatically altered' this court's jurisdiction to review final orders of the BIA." *Romero–Torres v. Ashcroft*, 327 F.3d 887, 889–90 (9th Cir.2003) (quoting *Kalaw v. INS*, 133 F.3d 1147, 1149 (9th Cir.1997)). Among other things, the statute divests circuit courts of jurisdiction to review removal orders based on certain criminal violations and of jurisdiction to review many discretionary aspects of immigration decision-making.[8]

As we discussed in *Falcon Carriche*, troubling situations "could arise where both [reviewable] and [unreviewable] issues are presented to the BIA and the BIA's streamlining procedure prevents us from discerning the reasons for the BIA's decision." 350 F.3d at 855 n. 10. Borrowing an example from *Falcon Carriche*, suppose that an IJ denies a petitioner's application for cancellation of removal on the ground that the petitioner failed to establish "exceptional and extremely unusual hardship." *See* 8 U.S.C. § 1229b(b)(1)(D) (2000). We have no jurisdiction to review that discretionary determination. *See Romero–Torres*, 327 F.3d at 890. Assume further that the BIA streamlines and affirms without opinion, upholding the IJ solely on the ground that the petitioner failed to meet the ten-year physical presence requirement, a determination that we do have jurisdiction to review. Because the BIA does not issue a reasoned deci-

---

**8.** *See, e.g.,* 8 U.S.C. § 1158(a)(3) (2000) (barring judicial review in asylum cases of whether a safe third country exists, whether an asylum application was timely filed, whether changed circumstances exist which materially affect the applicant's eligibility for asylum, and whether extraordinary circumstances exist to excuse failure to file within the one-year limitations period); 8 U.S.C. § 1158(b)(2)(d) (2000) (barring judicial review of administrative decision that claimant is ineligible for asylum because of suspected terrorist activities); 8 U.S.C. § 1252(a)(2)(C) (2000) (barring judicial review of administrative decisions to remove persons from the United States because they have committed certain criminal offenses); 8 U.S.C. § 1252(b)(4)(D) (2000) (allowing judicial review of asylum determinations of the Attorney General only when such determinations are "manifestly contrary to the law and an abuse of discretion"); *Romero–Torres*, 327 F.3d at 890(holding that the IIRIRA eliminated our jurisdiction to review "discretionary decisions involved in the cancellation of removal context, including the ultimate discretionary decision to deny relief").

sion, "the IJ's decision is controlling and no judicial review is available." *Falcon Carriche*, 350 F.3d at 855 n. 10. "In another troubling scenario, if the petitioner presents new and legitimate arguments to the BIA but is simply met with an 'Affirmed without Opinion' decision, the petitioner may also be faced with a jurisdictional default in the court of appeals." *Id.*

*Falcon Carriche* expressed no opinion on how to deal with the above hypotheticals, because the issues involved were not squarely presented in that appeal. *Id.* This appeal requires us to consider a closely related scenario. The facts are slightly different, but the overarching concern is the same—the specter of an unwarranted jurisdictional default and erroneous removal engendered by the interplay between the IIRIRA's jurisdictional bars and the BIA's streamlining regulations. Here, the IJ denied Lanza's application for asylum on two alternative grounds: one reviewable in federal court and the other unreviewable. The BIA streamlined and issued an affirmance without opinion. Because the affirmance without opinion endorses only the result of the IJ's decision and not its reasoning, we do not know whether the BIA's decision was based on the reviewable or unreviewable ground, or both.

The Government argues that the IJ's untimeliness finding controls and that we should dismiss Lanza's appeal for want of jurisdiction. This ignores the peculiar design of the streamlining regulations, which allow the BIA to affirm the result but not the rationale of the IJ. The BIA could very well have rejected the IJ's untimeliness determination but affirmed on the merits. If the BIA erred on the merits and we dismiss solely on the basis of untimeliness, Lanza will be wrongly removed to a country where she insists she will be persecuted without receiving the benefit of her statutory right to have this Court review the BIA's decision on the merits. Such a denial of review raises serious due process concerns, particularly, where as here, the alien alleges that removal will threaten her life and liberty.

## 2. Due Process

■ Aliens who have entered the United States—whether legally or illegally—cannot be expelled without the government following established procedures consistent with the requirements of due process. *Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953). "The due process afforded aliens stems from those statutory rights granted by Congress and the principle that '[m]inimum due process rights attach to statutory rights.'" *Dia v. Ashcroft*, 353 F.3d 228, 239 (3d Cir.2003) (alteration in original) (quoting *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir.1996)). Among other things, Congress has given asylum seekers the right to present evidence to an IJ, 8 U.S.C. § 1229a(b)(4)(B), the right to move to reconsider any decision that the applicant is removable, 8 U.S.C. § 1229a(c)(5), and most importantly for the purposes of this appeal, the right to judicial review by a court of appeals of final Agency orders denying asylum on the merits and directing removal, 8 U.S.C. § 1252(a)(2)(B)(ii).

This right to review in the courts of appeal is not something to be taken lightly or easily disregarded. The liberty interests involved in removal proceedings are of the highest order. Removal "visits a great hardship on the individual and deprives him [or her] of the right to stay and live and work in this land of freedom." *Bridges v. Wixon*, 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945). It is "a drastic measure" and for some "the equivalent of banishment or exile." *Jordan v. De George*, 341 U.S. 223, 231, 71 S.Ct. 703,

95 L.Ed. 886 (1951). The concern behind an alien's right to petition this Court for relief is a familiar one—that personal freedom can only be preserved when there are institutional checks on arbitrary government action.

If the BIA rejected the IJ's untimeliness finding and affirmed on the merits, then Lanza has a statutory right to have a federal court review that decision. Given the serious hardship that removal may pose to the Petitioner, we cannot simply assume that the BIA relied on the IJ's untimeliness finding and dismiss for lack of jurisdiction. If due process is to mean anything at all, it requires us to do more than that. The BIA's affirmance without opinion not only fails to adopt the IJ's findings and reasoning, it expressly disavows endorsing them. *See* 8 C.F.R. § 1003.1(e)(4)(ii). To dismiss Lanza's asylum claim for lack of jurisdiction would ignore the reality that the BIA may have affirmed the IJ solely on the merits.

The real question is not whether we will dismiss Lanza's appeal based on the mere possibility of a jurisdictional default, but rather whether we will remand to the BIA with instructions to clarify the grounds for its decision or instead proceed directly to the merits of Lanza's asylum claim. Some action must be taken. Lanza's right of judicial review is too weighty and our obligation to protect that right—grounded in the requirements of due process—too great. The BIA's affirmance without opinion, which endorses the result but not the reasoning of the IJ's decision, is too thin a

reed on which to find a jurisdictional default and remove Lanza to a country that she alleges will subject her to persecution.

### 3. The Options

In considering our potential options—sending this case back to the BIA to untangle the confusion it has created or proceeding straight to the merits—we must decide at the out-set whether we even have the power to proceed to the merits. The First Circuit touched on this issue briefly in *Haoud v. Ashcroft*, 350 F.3d 201, 205 (1st Cir.2003). In *Haoud*, the IJ found that the petitioner's asylum application was untimely 16193 and alternatively denied the petitioner's application on the merits. *Id.* at 203. The BIA affirmed without opinion. *Id.* at 204. Faced with the same problem that we face here, the First Circuit noted that "[the affirmance without opinion] in this case gives us no guidance as to whether the Board affirmed the IJ's decision on a non-reviewable basis, i.e. untimeliness, or a reviewable basis, i.e. the merits of Haoud's asylum claim." *Id.* at 206. Although it ultimately remanded the case to the BIA for a different reason,[9] it stated in *dictum* that "[the affirmance without opinion] cannot be used to deny our legitimate review power if we are left without a proper basis to determine our own jurisdiction."[10] *Id.* at 205.

This statement reveals that the First Circuit assumed it had no power to proceed directly to the merits of the petitioner's asylum claim—that it could not de-

---

**9.** The court remanded petitioner's asylum claim to the BIA so that it could consider a new precedent that the IJ did not have an opportunity to address. *Id.* at 208. Lanza has not alleged that any new precedent bears on her claims for relief.

**10.** The Fifth Circuit echoed this statement recently in *Zhu v. Ashcroft*, 382 F.3d 521, 527 (5th Cir.2004). The IJ denied the petitioner's

asylum application based on failure to file within the one-year limitations period and on the merits, and the BIA streamlined the case. *Id.* The court found, without much substantive discussion, that the BIA's affirmance without opinion created a "jurisdictional conundrum" and remanded so that the BIA could indicate the reasons for the denial. *Id.*

termine its "jurisdiction" without more. Undoubtedly animating the court was a reluctance to issue a potentially nondispositive opinion. If the court reached the merits and reversed the IJ, it would have to remand the case to the BIA to adopt or reject the IJ's untimeliness finding as only the BIA has the power to do. *See Falcon Carriche*, 350 F.3d at 856 n. 2 (Nelson, J., concurring in part and dissenting in part). If the BIA then adopted the untimeliness determination on remand, the court's decision on the merits would have no effect on the judgment. Given the constitutional ban on advisory opinions, there exists a strong judicial aversion to render potentially nondispositive rulings.

As Justice Jackson commented in a related context, judicial review serves "to correct wrong judgments, not to revise opinions." *Herb v. Pitcairn*, 324 U.S. 117, 126, 65 S.Ct. 459, 89 L.Ed. 789 (1945).

Justice Jackson was speaking of the Supreme Court's adequate and independent state grounds doctrine, and that doctrine is instructive here. The Supreme Court's appellate jurisdiction—like this Court's jurisdiction—is a creature of statute. In *Murdock v. City of Memphis*, 87 U.S. (20 Wall.) 590, 635, 22 L.Ed. 429 (1874), the Supreme Court—construing the 1867 amendments to the Judiciary Act of 1789—held that it is "not authorized to examine [state law] questions for the purpose of deciding whether the State court ruled correctly on them or not." The Court concluded that if an appellant presented a federal question that had been decided incorrectly by the state court, it would examine the record to see if it contained alternative grounds "actually decided by the State court which are sufficient to maintain the judgment of that court, notwithstanding the error in deciding the Federal question." *Id.* If such a ground

existed, the Court stated,"the judgment must be affirmed without inquiring into the soundness of the decision on such other matter or issue." *Id.* at 636.

Soon after the *Murdock* decision, the Court began its current practice of dismissing for want of jurisdiction cases in which the judgment rested on an adequate and independent state law ground, commenting that this was the "logical course." *Eustis v. Bolles,* 150 U.S. 361, 370, 14 S.Ct. 131, 37 L.Ed. 1111 (1893). Later, the Court held that the existence of an adequate and independent state ground supporting a judgment meant that the Court "ha[d] no power to disturb it." *Enter. Irrigation Dist. v. Farmers Mut. Canal Co.*, 243 U.S. 157, 164, 37 S.Ct. 318, 61 L.Ed. 644 (1917). Finally, in *Herb*, 324 U.S. at 126, the jurisdictional barrier was described as one of constitutional magnitude: "[I]f the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion." In this case—as in an adequate and independent state grounds case—if the BIA had clearly affirmed on the basis of the IJ's untimeliness determination, we would lack jurisdiction to review the merits of Lanza's asylum claim. Any decision on the merits would be purely advisory and would have no effect on the judgment.

Some limitations on the state grounds doctrine exist, however, and one is particularly relevant here. As in this case, the state court's decision sometimes leaves it unclear whether the decision rests on a reviewable (i.e., federal law) or unreviewable (i.e., state law) ground. In the typically ambiguous case, the state court will have focused almost exclusively on federal constitutional law and then concluded that the result was required under both federal and state law. Before 1983, the Supreme

Court used several ad-hoc approaches to deal with this problem. In some cases, the Court examined the state's theory of state constitutional law in an attempt to determine whether the state's rule operated independently. *See, e.g., Texas v. Brown,* 460 U.S. 730, 733 n. 1, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). In others, the Court refused to hear the matter until the state court clarified whether its decision was meant to rest on an independent state law basis. *See, e.g., Minnesota v. Nat'l Tea Co.,* 309 U.S. 551, 557, 60 S.Ct. 676, 84 L.Ed. 920 (1940). And in others, the Court dismissed the appeal when the grounds for the decision were unclear. *See, e.g., Adams v. Russell,* 229 U.S. 353, 358–61, 33 S.Ct. 846, 57 L.Ed. 1224 (1913).

In *Michigan v. Long,* 463 U.S. 1032, 1038–42, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Court reconsidered these approaches and articulated a presumption in favor of Supreme Court review. The Court held that in ambiguously grounded cases, it would assume that "the state court decided the case the way it did because it believed that federal law required it to do so" whenever the following two conditions exist. *Id.* at 1041, 103 S.Ct. 3469. First, the decision must "fairly appear[ ] to rest primarily on federal law, or to be interwoven with the federal law," and second,"the adequacy and independence of any possible state law ground[must] not [be] clear from the face of the opinion." *Id.* at 1040–41, 103 S.Ct. 3469. The Court found that the alternative approaches were inadequate because they required either interpretation of unfamiliar state law, imposition of burdens on state courts through requests for clarification, or sacrifice of uniformity in federal law through dismissal of cases with federal law issues. *Id.* at 1039–40, 103 S.Ct. 3469.

■ In her brief, Lanza urges this Court to presume that the BIA affirmed on the merits and to review the merits of her asylum claim. While *Long* would provide a doctrinal linchpin to do so, we find that its rationale is inapplicable here, and that remand for clarification is the only constitutionally acceptable approach. The Supreme Court's holding in *Long* reveals an expansive attitude toward federal jurisdiction. But federal courts are courts of limited jurisdiction. *See, e.g., Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). "They possess only that power authorized by Constitution and [Congress]" and unlike state courts are not vested with general subject matter jurisdiction. *Id.* (internal citations omitted). There is a general presumption against federal court review, and the burden of establishing the contrary rests on the party asserting jurisdiction. *Id.* And even when federal courts have jurisdiction, they often decline review. The Supreme Court has, for instance, held that federal courts should abstain when there is an unclear issue of state law and clarification might avoid a ruling on a constitutional question. *See R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 501–02, 61 S.Ct. 643, 85 L.Ed. 971 (1941). It therefore "seems strange that a Supreme Court which has repeatedly limited federal jurisdiction and emphasized deference to state courts should create a strong presumption in favor of federal court review." Erwin Chemerinsky, *Federal Jurisdiction* § 10.5.3 (4th ed.2003).

*Long*'s presumption in favor of jurisdiction is, perhaps paradoxically, best understood through the prism of federalism. In *Long,* the Supreme Court argued that its presumption would allow it to avoid engaging in detailed analysis of how states understand their own constitutional law—a method that results in a decision of "state law that[goes] beyond the opinion [under]

review." *Long*, 463 U.S. at 1040, 103 S.Ct. 3469. The Court 16197 viewed the act of presuming jurisdiction in order to decide questions of federal law as more respectful of the state court than the act of scrutinizing the state's law. Under the *Long* approach, the state gains control over an interpretation of state law even as it suffers the loss of autonomy that comes with Supreme Court review. Similarly, the Court viewed remand for clarification as unduly intrusive on state courts. It found that remand put "significant burdens on state courts to demonstrate the presence or absence of [Supreme Court] jurisdiction." *Id.* The Court implied that this method shifts the burden of establishing jurisdiction away from the party asserting it, where it usually belongs, and intrusively places it on the state courts. *Id.*

*Long's* federalism concerns, however, are simply not applicable here. While federal courts give deference to administrative agencies in certain circumstances, *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), our relationship with those agencies is significantly less deferential than our relationship with the state courts. Congress has given us appellate jurisdiction over a wide variety of immigration decisions, and, in non-streamlined cases, we do not hesitate to remand to the BIA where the BIA has failed to clearly articulate the grounds for its decision. *See, e.g., Arrozal v. INS*, 159 F.3d 429, 433 (9th Cir.1998) ("[T]he BIA must indicate how it weighed [the favorable and unfavorable] factors and indicate with specificity that it heard and considered petitioner's claims."); *Mattis v. INS*, 774 F.2d 965, 968 (9th Cir.1985) (remanding where BIA failed to give reasoned explanation for denial of alien's motion to reopen deportation proceedings); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir.1994) ("If the agency has failed to provide a reasoned explanation for its action . . . the reviewing court may supplement the record or remand the case to the agency for further proceedings. . . ."). While remand for clarification may inconvenience the BIA, it is not as intrusive as remand to a state court; it is in fact our customary procedure.

Further, in *Long*, the Supreme Court did not apply its jurisdictional presumption without first reviewing the state court decision to determine whether it fairly rested on federal law or was interwoven with federal law. Rather, it analyzed the state court's decision to determine whether the state court had "relied *exclusively* on its understanding of *Terry* and other federal cases." *Long*, 463 U.S. at 1043, 103 S.Ct. 3469. Only after finding that the bare references to the state constitution "in no way indicate that the decision below rested on grounds in any way *independent* from the state court's interpretation of federal law," did the Court conclude that the state court relied "primarily" on federal law. *Id.* at 1044, 103 S.Ct. 3469. Thus, despite the ambiguity in the state court's opinion, the Court did not automatically presume jurisdiction. In this case, though we have a decision from the IJ, we have no means of even superficially determining whether the BIA relied on a reviewable or unreviewable ground in affirming the IJ. Unlike the Court in *Long*, we have nothing to rely on but speculation. Consequently, applying a presumption in favor of jurisdiction would be all the more drastic.

Application of the *Long* rule here might also have the undesirable effect of wasting scarce judicial resources and increasing the likelihood that our review of the merits would be nondispositive. In her dissenting opinion in *Arizona v. Evans*, 514 U.S. 1, 31–34, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), Justice Ginsburg urged the Su-

preme Court to overrule *Long*. Among other things, she argued that the *Long* presumption "has increased the incidence of nondispositive United States Supreme Court determinations—instances in which state courts, on remand, have reinstated their prior judgments after clarifying their reliance on state grounds." *Id.* "Even if these reinstatements do not render the Supreme Court's opinion technically 'advisory,'" she explained, "they do suggest that the Court unnecessarily spent its resources on cases better left, at the time in question, to state-court solution." *Id.* Remand for clarification in this case would not only avoid the unnecessary expenditure of time and effort but would also forestall the possibility of issuing a nondispositive opinion.

At any rate, *Long's* presumption in favor of review was never intended to be applied with inflexibility. *Long* itself reserved the possibility of remand for clarification in appropriate cases, 463 U.S. at 1041 n. 6, 103 S.Ct. 3469, and the Court has on occasion exercised that option. *See, e.g., Capital Cities Media, Inc. v. Toole,* 466 U.S. 378, 378, 104 S.Ct. 2144, 80 L.Ed.2d 378 (1984) (post-*Long* decision vacating state court judgment and remanding for clarification). A recent example occurred in *Bush v. Palm Beach County Canvassing Board,* 531 U.S. 70, 78, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000). In that case, a dispute arose over the deadline for county canvassing boards to submit their 2000 presidential election returns to the Florida Secretary of State. *Id.* at 73–74, 121 S.Ct. 471. The Secretary of State declined to waive the November 14, 2000 deadline set by statute to allow a recount to proceed. *Id.* at 74, 121 S.Ct. 471. The Florida Supreme Court, however, set the deadline at November 26. *Id.* at 76, 121 S.Ct. 471. After reviewing the state court's decision, the Court found " 'considerable uncertainty' " as to whether the court relied on state

or federal grounds in setting the deadline and remanded for clarification. *Id.* at 78, 121 S.Ct. 471 (quoting *Nat'l Tea Co.,* 309 U.S. at 555, 60 S.Ct. 676). " 'Intelligent exercise of [its] appellate powers,'" the Court held, " 'compel[led it] to ask for the elimination of the obscurities and ambiguities from [the state court's opinion].' " *Id.* (quoting *Nat'l Tea Co.,* 309 U.S. at 557, 60 S.Ct. 676.)

We too find that intelligent exercise of our appellate jurisdiction requires remand. Because the BIA affirmed without opinion, we have no way of knowing whether the BIA rejected Lanza's asylum claim on the basis of the IJ's procedural determination or his alternative finding on the merits. Due process requires us to either reach the merits or remand for clarification. Although *Long* provides some authority for proceeding to the merits, its functional justifications do not apply here. Given our limited jurisdiction and the general presumption against federal court review, we remand to the BIA with instructions to clarify the grounds for its rejection of Lanza's asylum application.

## II. The Withholding of Removal Claim

The BIA's affirmance without opinion does not impact our ability to review Lanza's withholding of removal claim. Unlike Lanza's asylum claim, the IJ rejected Lanza's withholding of removal claim solely on the merits. We have clear jurisdiction to review that determination. 8 U.S.C. § 1252(a) (2000); *Molina–Estrada v. INS,* 293 F.3d 1089, 1093 (9th Cir.2002). Although the BIA affirmed without opinion, the fact that we do not know the actual reasons for its decision is of no consequence. We may review the IJ's decision directly. *Falcon Carriche,* 350 F.3d at 851.

8 U.S.C. § 1231(b)(3)(A) prohibits the removal of anyone whose life or freedom would be threatened in his or her home country on account of any one of the same five grounds necessary for asylum. "Unlike an application for asylum, however, a grant of an alien's application for withholding is not a basis for adjustment to legal permanent resident status, family members are not granted derivative status, and [the relief] only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country." *Castellano–Chacon v. INS*, 341 F.3d 533, 545 (6th Cir.2003). In addition, "a greater quantum of proof is required as to the likelihood of persecution in the country of risk in order to establish eligibility for withholding." *Id.* In other words, courts "consider the same factors to determine eligibility for both asylum and withholding," but withholding of removal requires "a higher probability of persecution." *Id.*

■ Section 1231(b)(3)(A) sets forth the standard for withholding of removal. It provides: "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *Id.* The alien must establish by a "clear probability" that her life or freedom would be threatened in the proposed country of removal. *INS v. Stevic*, 467 U.S. 407, 413, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). A clear probability means "more likely than not." *Id.* at 429–30, 104 S.Ct. 2489. This standard is "more stringent than asylum's 'well-founded fear' [standard] because withholding of removal is a mandatory form of relief." *Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 (9th Cir.1999).

"If the applicant is determined to have suffered past persecution in the proposed country of removal ... it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 208.16(b)(1)(i) (2004). "If the alien does not establish past persecution, however, the presumption of future persecution does not apply." *Molina–Estrada*, 293 F.3d at 1094 (citing *Duarte de Guinac*, 179 F.3d at 1159); *see also* 8 C.F.R. § 208.16(b)(1)(i). The applicant must instead " 'show a good reason to fear *future* persecution by adducing credible, direct, and specific evidence in the record of facts that would support a reasonable fear of persecution.' " *Molina–Estrada*, 293 F.3d at 1094 (quoting *Duarte de Guinac*, 179 F.3d at 1159).

■ We apply a substantial evidence standard of review to the Agency's findings of fact in withholding of removal cases. *He v. Ashcroft*, 328 F.3d 593, 595 (9th Cir.2003). Under this standard, we must uphold an IJ's findings of fact as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (2000). "Adverse credibility findings are thus accorded significant deference, but the IJ and the BIA must nonetheless offer a 'specific, cogent reason for any stated disbelief.' " *He*, 328 F.3d at 595 (quoting *Hartooni v. INS*, 21 F.3d 336, 342(9th Cir.1994)). The Agency's determination of purely legal questions is reviewed *de novo*, subject to established principles of deference. *Id.*

### A. Past Persecution

■ Substantial evidence supports the IJ's conclusion that Lanza did not establish past persecution. To establish past persecution, applicants must demonstrate that (1) their experiences rise to the level of persecution, (2) the persecution was on account of one or more of the five protect-

ed grounds, and (3) the persecution was committed either by the government or by forces that the government was unable or unwilling to control. *Chand v. INS*, 222 F.3d 1066, 1073 (9th Cir.2000).

We have defined persecution as " 'the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive.' " *Korablina v. INS*, 158 F.3d 1038, 1043 (9th Cir.1998) (quoting *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995)). But we have also cautioned that "persecution ... is 'an extreme concept that does not include every sort of treatment our society regards as offensive.' " *Nagoulko v. INS*, 333 F.3d 1012, 1016 (9th Cir.2003) (quoting *Korablina*, 158 F.3d at 1043). Thus, not all negative treatment equates with persecution. *Compare Prasad*, 47 F.3d at 339–40 (beating during brief detention and questioning of applicant about his support for political party did not compel finding of persecution) *with Chanchavac v. INS*, 207 F.3d 584, 589–91 (9th Cir.2000) (invasion into petitioner's home followed by beating so severe that the petitioner was bedridden for two days, coupled with repeated attacks against petitioner's family and village, constituted persecution).

■ The IJ found that Lanza's home invasion story was not credible, and the record does not compel a contrary conclusion. Although Lanza claimed that the incident caused her to flee Argentina, she applied for a passport a few weeks before it allegedly happened. And though Lanza testified that she had no intention to travel to the United States upon her arrival in Mexico, she had "John's" contact information before leaving for Mexico; she left for the United States less than a week after arriving in Mexico; and she did not apply for asylum until she was placed in removal proceedings almost ten years after arriving in the United States. This suggested to the IJ that Lanza made a concerted effort to get into this country and that the home invasion story was simply a post hoc justification.[11] The evidence is sufficient to uphold this finding.

■ Even if we were to assume that Lanza's story is true, we cannot say that the IJ erred in finding that Lanza did not suffer past persecution. Lanza testified that she was blacklisted by the Menem government. She also testified that on one occasion she was pushed, punched, called names, and threatened with her life if she continued her political activities. Although these actions are reprehensible if in fact true, they are not "so overwhelming so as to necessarily constitute persecution ... on account of political opinion." *Prasad*, 47 F.3d at 339–40 (holding that the BIA did not err in finding that beating during short detention did not amount to persecution); *see also Lim v. INS*, 224 F.3d 929, 936 (9th Cir.2000) (unfulfilled threats alone, in most cases, will not compel a finding of past persecution). We might reach a different conclusion if reviewing *de novo;* however, our standard of review is deferential, and the evidence does not compel reversal on this issue.

## B. Clear Probability of Future Persecution

■ The evidence also falls short of compelling the conclusion that it is "more likely than not" that Lanza will be persecuted if she returns to Argentina. *Stevic*, 467 U.S. at 429, 104 S.Ct. 2489. Lanza's alleged persecution occurred more than ten years ago. There is no reason in the

---

11. A passport, of course, could be issued to a person who is undesired in a country, with the sole purpose of securing his or her departure, but the record does not compel this conclusion here.

record to warrant a belief that Lanza's alleged persecutors would still be interested in her. Lanza's brother, who was also a member of the UCR, continues to live in Argentina and has suffered no persecution.

Although he was allegedly less active in the UCR and more willing to compromise with the government, his situation diminishes the force of Lanza's withholding of removal claim.[12] *See Lim*, 224 F.3d at 935 ("This court has allowed ongoing family safety to mitigate a well-founded fear, particularly where the family is similarly situated to the applicant and thus presumably subject to similar risk."). More importantly, the State Department Country Report relied on by the IJ contains no mention of persecution of UCR members or other political groups.[13] Although the Report mentions that the police have broken up some political demonstrations and that some high-profile journalists have been harassed, these instances are insignificant in the context of the Report as a whole.[14] On

this record, we cannot say that Lanza has established a clear probability of future persecution.

## III. The CAT Claim

Like Lanza's withholding of removal claim, no barriers exist to our review of Lanza's CAT claim. The IJ rejected Lanza's CAT claim solely on the merits, and we have jurisdiction to review that finding under § 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105–277, 112 Stat. 2681, 2681–821 (1999). *Zheng v. Ashcroft*, 332 F.3d 1186, 1188 n. 2 (9th Cir.2003). Although the BIA affirmed without opinion, we do not need a reasoned decision from the BIA because we may review the IJ's decision directly. *Falcon Carriche*, 350 F.3d at 851.

Under the CAT's implementing regulations, the applicant bears the burden of proof "to establish that it is more likely

---

12. We do not agree, however, with the IJ's finding that "since [Lanza] would be able to prevent persecution by her silence and would only be persecuted if she chose to speak," she is ineligible for withholding of removal. This position would largely eviscerate political opinion as a basis for refugee status. As the High Commissioner for Refugees points out in a related context, "[d]ue to the strength of[the applicant's] convictions ... it may be reasonable to assume that his opinions will sooner or later find expression and that the applicant will, as a result, come into conflict with the authorities." *Handbook on Procedures and Criteria for Determining Refugee Status*, Office of the U.N. High Comm'r for Refugees, pt. 1, ch. II(B)(3)(f) ¶ 83, U.N. Doc. HCR/IP/4/Eng/REV.1 (1979). The *Handbook* "provides 'significant guidance' to courts in determining refugee status." *Tagaga v. INS*, 228 F.3d 1030, 1035 n. 11 (9th Cir.2000) (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 439 n. 22, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). But even if the IJ erred on this point, the record contains ample evidence to support his ultimate denial of Lanza's withholding of removal claim.

13. This Court has described the State Department reports as " 'the most appropriate and perhaps the best resource' for 'information on the political situations in foreign nations.' " *Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir.1995) (quoting *Rojas v. INS*, 937 F.2d 186, 190 n. 1 (5th Cir.1991)).

14. Lanza asserts that conditions in Argentina have now deteriorated. We may not consider this evidence:

"[W]e must consider the facts in the administrative record as if they speak to the current situation. Indeed, any remand in such circumstances would be extremely unfair to litigants, potentially triggering multiple determinations and repeated appeals as to whether there is any 'current' persecution—a sort of Zeno's Paradox in which the arrow could never reach the target. This differs from a determination of past persecution, where remand is necessary to determine whether conditions in a country have changed."

*Avetova–Elisseva v. INS*, 213 F.3d 1192, 1198 n. 9 (9th Cir.2000).

than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2) (2004). The torture must be inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1) (2004). The evidence that the decision-maker should consider in evaluating whether the petitioner would be tortured includes "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal" and "[o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 208.16(c)(3).

"[T]he Convention's reach is both broader and narrower than that of a claim for asylum or withholding of deportation: coverage is broader because a petitioner need not show that he or she would be tortured on account of a protected ground ...." *Kamalthas v. INS*, 251 F.3d 1279, 1283 (2001) (internal quotation omitted). It is narrower "because the petitioner must show that it is 'more likely than not' that he or she will be tortured, and not simply persecuted upon removal to a given country." *Id.* (internal quotation omitted). In other words, the Convention "focuses on the particularized threat of torture, rather than any other form of persecution, should the alien return to the country at issue, although the torture must be inflicted, instigated, consented to, or acquiesced in, by state actors." *Castellano–Chacon*, 341 F.3d at 551–52.

We apply a substantial evidence standard of review to claims under the Convention Against Torture. *Zheng*, 332 F.3d at 1193. Administrative findings of fact must be affirmed "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We may reverse "only if the evidence is so compelling that no rea-

sonable fact finder could have failed to find the requisite likelihood of torture." *Singh v. Ashcroft*, 351 F.3d 435, 442(9th Cir. 2003). We review the Agency's determination of purely legal questions *de novo*, though its interpretation and application of law are subject to established principles of deference. *Id.*

██ Substantial evidence supports the IJ's denial of CAT relief. From the information contained in the 1998 State Department Country Report for Argentina, the IJ properly found that Lanza had not shown that it was more likely than not that she would be tortured by anyone on any ground. The Report observed that the Argentine constitution prohibits torture and that the criminal code provides penalties for those who torture similar to the penalties for homicide. Although the Report notes that police brutality is a problem, it gives no indication that the police target suspects on the basis of political opinion. We accordingly uphold the denial of CAT relief.

## CONCLUSION

We affirm the BIA's denial of Lanza's withholding of removal and Convention Against Torture claims. We vacate the BIA's denial of Lanza's asylum claim and remand for proceedings consistent with this opinion.

PAEZ, Circuit Judge, concurring and dissenting:

I concur in the majority's decision to remand Lanza's asylum claim, because it is impossible to discern whether the BIA's final order dismissing Lanza's appeal from the Immigration Judge's decision was based on untimeliness, and therefore outside of our jurisdiction, or based on the merits of her claim and suitable for review. I agree, in this procedural context, that we should remand to the BIA to specify the

basis for its decision so that we may determine whether we have jurisdiction over Lanza's asylum claim.

I respectfully dissent, however, from the majority's decision to reach the merits of Lanza's withholding of removal and Convention Against Torture (CAT) claims. Because the asylum and withholding claims are factually interrelated and because, in my view, it is best to avoid piecemeal resolution of Lanza's several claims, I would remand all of her claims to the BIA.

Our jurisdiction to determine whether we have jurisdiction in a particular case is well-established and provides a sufficient basis for our remand order. *See, e.g., United States v. Ventre,* 338 F.3d 1047, 1051 (9th Cir.2003). A determination of whether we have jurisdiction in this case simply requires further information as to the reason behind the BIA's affirmance. *See Gelman v. Ashcroft,* 298 F.3d 150, 152 (2d Cir.2002) (asserting jurisdiction for the limited purpose of remanding to the BIA to inform the court's analysis of whether it had jurisdiction). Our decision to remand here is supported by our practice in other contexts to remand to the BIA for clarification or to address an issue in the first instance. *See, e.g., Li v. Ashcroft,* 356 F.3d 1153, 1161 (9th Cir.2004) (en banc); *Arrozal v. INS,* 159 F.3d 429, 433 (9th Cir.1998); *Mattis v. INS,* 774 F.2d 965, 968 (9th Cir.1985).

Further, our decision is consistent with the Fifth Circuit's recent decision in *Zhu v. Ashcroft.* 382 F.3d 521 (5th Cir.2004). There, the court, when confronted with the same jurisdictional question that we face here, remanded Zhu's entire case to the BIA for clarification of the basis for its affirmance of the Immigration Judge's denial of Zhu's asylum claim. *Id.* at 527. *See also Haoud v. Ashcroft,* 350 F.3d 201, 205–06 (1st Cir.2003) (remanding the BIA's streamlined decision when the basis for its decision was unclear). In brief, I would ground our decision to remand on our authority to determine whether we have jurisdiction over Lanza's asylum claim. This approach, in my view, goes to the heart of the jurisdictional dilemma created by the BIA's affirmance without opinion.

The majority compares our position in reviewing orders of the BIA to the Supreme Court's role in reviewing state court decisions on constitutional grounds. The adequate and independent state ground doctrine, however, is inappropriate to this context and is driven by different concerns, as the majority points out. I do not believe the majority's extended analogy illuminates our decision here and I therefore decline to join it.

Finally, I dissent from the majority's disposition of Lanza's withholding of removal and CAT claims. We should avoid resolution of issues on the merits until the jurisdictional issue is resolved. The majority's determination of Lanza's withholding claim involves essentially the same analysis as would a decision on her asylum claim; they should therefore be determined concurrently. Although Lanza's CAT claim employs a different analytical framework, it parallels her asylum and withholding claims and I would similarly decline to reach the merits of that claim until the BIA provides an explanation for its affirmance.

For the reasons above, I would grant the petition and remand to the BIA for clarification of the basis for its decision to affirm the Immigration Judge's denial of Lanza's asylum claim.